# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

JEFFREY E. AKARD,

Petitioner,

v.

WARDEN,

Respondent.

CAUSE NO.: 2:17-CV-123

## <u>OPINION & ORDER</u>

Jeffrey E. Akard, a prisoner without a lawyer, filed a habeas corpus petition to challenge his convictions for rape, criminal deviate conduct, criminal confinement, and battery under cause number 79C02-810-FA-36. ECF 1. Following a jury trial, on February 11, 2009, the Tippecanoe Superior Court issued a sentence of ninety-three years of incarceration, which the Indiana Supreme Court later increased to ninety-four years. For the reasons set forth below, the Court:

(1) **DENIES** the habeas corpus petition ECF 1;

(2) **DENIES** the motion for discovery ECF 18;

(3) **DECLINES** to issue a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and

(4) **DIRECTS** the clerk to enter judgment in favor of the Respondent and against the Petitioner.

BACKGROUND

In deciding this habeas petition, the Court must presume the facts set forth by the State courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:[1]

> In the early hours of September 9, 2006, A.A. was in Lafayette, Indiana, and met Akard as he was walking down the street. Because he was purportedly drunk, Akard asked A.A. to walk him home so that he would not be charged with public intoxication, and A.A. obliged. After a fifteen minute walk, the two arrived at Akard's house at approximately 2:15 a.m., and A.A. went into the house so that she could use the bathroom. Once inside, Akard used a key to lock the deadbolt. The two then sat down on the couch and started a conversation, which included A.A. telling Akard that she was currently homeless and without any money. The topic eventually turned to Akard offering A.A. $150 for a 'head job.' A.A. agreed and proceeded to perform an act of oral sex on Akard. During the act, Akard grabbed A.A.'s head and forced her onto him to the point A.A. was choking and had 'snot coming out of [her] nose.' Akard continued to force A.A.'s head back and forth until he lifted her up and told her that 'today was the day [she] was gonna die.'
>
> A.A. repeatedly begged Akard to let her leave, but Akard ordered her to the bathroom and proceeded to cut A.A.'s t-shirt and bra in order to remove them. Akard then ordered A.A. to remove her pants and go into the bedroom. Despite A.A.'s repeated pleas to leave, Akard told her that she could not leave. Once in the bedroom, Akard said that he had 'a toy' for A.A., reached under the bed, and then used a taser gun on A.A.'s back and

---

[1] Akard disputes the facts as set forth by the State courts, citing medical evidence and photographs. However, this evidence, discussed more fully below, does not rise to the level of clear and convincing evidence.

heart area approximately five times. When A.A. began
to scream, Akard reached under the bed for his handgun
and held it to A.A.'s head.

A.A. then sat on the bed while Akard handcuffed her
arms behind her back. Akard then forced A.A. to take
some pills with Mountain Dew. During the process, A.A.
spilled some of the Mountain Dew, causing Akard to
become upset and hit A.A. in the head.

Akard then ordered A.A. back to the bathroom where
Akard undressed and they both entered the shower. While
in the shower, Akard made A.A. kneel so that he could
urinate in her mouth. A.A. spit out the urine, which
upset Akard. Akard then hit A.A., knocking her
unconscious.

When she awoke, she was lying face down on Akard's bed
and now had zip ties restraining her ankles. As A.A.
faded in and out of consciousness, Akard raped her
vaginally and anally a total of four to five times. To
prevent A.A. from screaming, Akard placed a golf ball
in A.A.'s toothless mouth and then used a sock as a
gag. While A.A. was bound, Akard used sex toys on both
of them. At one point, A.A. woke up and noticed
stockings on her legs that were not hers. During
another instance of consciousness, A.A. realized that
she had a metal, link chain tied around her and tied
to the door, so that the chain would rattle every time
she moved.

At another point when A.A. was only bound in handcuffs,
Akard called out to A.A. from the living room, telling
her to come to that room. Akard then showed A.A. 'a
lot' of pictures of child pornography on his laptop.
During this display, Akard said that he had 'done
plenty' of children.

When A.A. finally woke the next day, she was in the
bed and the chain was still around her. Pretending not
to remember what happened, she commented to Akard, 'we
must have had some really kinky sex last night[.]'
A.A. then indicated that she needed to leave
immediately because she had to pick up her children.
Akard responded, 'Are we okay?' A.A. indicated
affirmatively. Akard then told A.A. that she had to

take a shower before she left, which she did but purposely did not use soap.

Immediately after leaving Akard's apartment on the afternoon of September 9, 2006, A.A. ran to a neighboring house to obtain assistance. After A.A. told the neighbor that she was held against her will for nineteen hours and displayed her wounds, the neighbor called 9-1-1. After police responded and initially interviewed A.A., she was taken to the hospital where samples were collected for a rape kit analysis and pictures of A.A.'s wounds were taken.

The police obtained a search warrant for Akard's apartment based on A.A.'s statement and executed it early on the morning of September 10, 2006. When the officers breached the door, Akard was sitting on his couch, viewing pornography on his computer while masturbating. Items recovered from the apartment search included a set of keys on a key chain including a handcuff key, zip ties, a woman's Old Navy shirt that had been cut as well as a bra, a pair of handcuffs, a metal link chain, two golf balls and 'fairly stretchable' socks, a stun gun, bottles of Tylenol, Tylenol PM, Doxycycline, Alprazolam and Hydrocodone, A.A.'s identification card and cell phone, a collection of sex toys, a BB gun, an air rifle, a handgun, purple and orange rope that was tied to the bed frame, blue stockings, and a laptop containing approximately 2900 pornographic pictures.

*Akard v. State*, 924 N.E.2d 202, 205-06 (Ind. Ct. App. 2010); ECF 14-6 at 2-5.

Akard argues that he is entitled to habeas corpus relief, alleging that he was denied effective assistance of counsel when trial counsel: (1) failed to obtain medical records and failed to call medical witnesses at trial; (2) failed to object to child pornography evidence; (3) failed to impeach the victim on cross-examination, which also violated his Sixth Amendment right

4

confront his accuser; (4) failed to discuss a guilty plea; and (5) failed to challenge the sentence. He also asserts that he is actually innocent.


PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the Court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814-15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies

without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

Akard presented his ineffective assistance claims to the Court of Appeals of Indiana (ECF 14-15 at 9-22) but abandoned the claims relating to impeachment, a guilty plea, and sentencing when he petitioned for transfer to the Indiana Supreme Court. ECF 14-20. Akard argues that he presented these claims to the Indiana Supreme Court because that court had access to the Court of Appeals of Indiana filings. However, the petition to transfer contains no reference to these claims and provided the Indiana Supreme Court with no indication that Akard wanted that court to consider them. Because he did not fully and fairly present these claims through one full round of state court review, they are procedurally defaulted.

By contrast, Akard does refer his ineffective assistance claims regarding medical evidence and child pornography evidence in his petition to transfer to the Indiana Supreme Court.[2] ECF 14-15 at 14-19; ECF 14-20 at 9, 13. Respondent argues that Akard did not fairly present these claims to the Indiana Supreme Court because they are nested within another claim. Claims nested within a claim must "be either (1) framed so it could stand on its own,

_____

[2] Akard listed two questions in the "Questions Presented on Transfer" section of his petition to the Indiana Supreme Court on appeal during his post-conviction proceedings, but he raises neither of them before this Court. ECF 20-14 at 3.

were it presented in a different section of the post-conviction petition or (2) supported by very substantial analysis throughout the petition." *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013). Here, because Akard at least mentioned these two claims in the petition to transfer, the Court will assume without deciding that Akard fairly presented these claims to the Indiana Supreme Court and will consider them on the merits.[3]

Akard argues that Indiana Rules of Appellate Procedure forced him to abandon some of his claims in the petition for transfer due to page and word limits, which the Court construes as a cause-and-prejudice argument. A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 2382 (2009). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" which prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). A petition to transfer filed with the Indiana Supreme Court may only contain either ten pages or 4,200 words. Ind. R. App. 44. Akard suggests that

---

[3] Notably, federal courts have the discretion to consider claims for habeas relief under certain circumstances even if such claims are procedurally barred. 28 U.S.C. § 2254(b)(2).

presenting his ineffective assistance of counsel claims within these constraints would have been impossible. However, Akard was able to articulate these claims in just four pages in his petition for post-conviction relief. PCR Appeal App. 17-21. Additionally, the Indiana Appellate Rule 34 allows litigants to file motions for leave to file petitions in excess of the page and word limits, which Akard did not do.[4] ECF 14-14. In sum, Akard has not demonstrated that the cause-and-prejudice exception applies to his claims.

Akard also asserts a claim of actual innocence, but it is unclear as to whether he asserts it as a freestanding claim or as an excuse to procedural bar. Because actual innocence is not a recognized basis for habeas relief, the Court construes the assertion of actual innocence as an excuse to procedural bar. *See Herrera v. Collins*, 506 U.S. 390, 404-05 (1993); *Tabb v. Christianson*, 855 F.3d 757, 764 (7th Cir. 2017). A habeas petitioner can also overcome a procedural default by establishing that a court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006). To meet this exception, the petitioner must establish that "a constitutional violation has resulted in the

---

[4] Moreover, Akard expressly informed the Indiana Supreme Court that he had access to the Indiana Rules of Appellate Procedure when he filed his petition to transfer. ECF 14-20 at 6.

conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536–37 (2006). In this context, a court may consider evidence only if it is reliable and was not presented at trial. *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir. 2015).

As new evidence, Akard lists: (1) a photograph of a window from the inside of his apartment bathroom; (2) medical reports from the initial medical examination of the victim and the testimony of EMTs Phil Bushman and Cole Gilbert and Dr. Natalie Schwartz related to those medical reports; and (3) photographs of the victim's elbow. The record shows that the medical reports from the initial medical examination of the victim and the testimony of Kathleen Smith, the nurse who examined the victim, were admitted at trial. Trial Tr. 181-204. Though Bushman, Gilbert, and Dr. Schwartz did not testify at trial, Akard does not argue that their testimony would have added any exculpatory facts not included in the medical reports. Additionally, photographs of both of the victim's elbows were also admitted at trial. *Id.* at 122-23. Therefore, the medical evidence listed by Akard and the photograph of the victim's elbow do not constitute new evidence.

By contrast, the photograph of a window from the inside of Akard's bathroom does constitute new evidence. Akard argues that such a photograph would have shown that the victim had an opportunity to leave his apartment and that she was not confined. The Court must consider whether this new evidence would have affected the outcome at trial. Notably, an exterior photograph of the bathroom window was admitted at trial, and Akard testified as follows:

> **Trial Counsel:** Defendant's Exhibit D and tell the jury what's depicted in that photograph.
>
> **Akard:** That's the back side of the house where I live and it's the portion which would be my apartment.
>
> **Trial Counsel:** Okay. And is there a window depicted there?
>
> **Akard:** Yes.
>
> **Trial Counsel:** From that view. And from---that window enters into where?
>
> **Akard:** Into the bathroom.
>
> **Trial Counsel:** Okay. So there's a bathroom window and a rear exit to your apartment.
>
> **Akard:** Yes.
>
> **Trial Counsel:** Okay. Move to offer Defendant's Exhibit D.
>
> **The Court:** Any objection?
>
> **Prosecution:** No.
>
> **The Court:** Admitted.

**Trial Counsel:** Now, you've described a kind of locking device that was on your front door. The door was leading from your kitchen back entrance, what kind of locking device, if any, was on that?

**Akard:** A very inadequate lock. It's just one you just flip with your finger. You can't even use a key from the outside. It takes no key.

**Trial Counsel:** Okay. At any time throughout the period of time that you were with [the victim] did you ever make a demand to leave?

**Akard:** No.

**Trial Counsel:** At any time did you ever hold her against her will?

**Akard:** No.

**Trial Counsel:** Was there a significant amount of time after the sexual encounter had been completed---was she free to go and physically able to leave your apartment?

**Akard:** Yes.

*Id.* at 477-78.

Additionally, the victim herself admitted that it was possible that she could have left through a window:

**Prosecution:** Okay. Was there any way for you to get out of the house without him unlocking the door?

**Victim:** No way---no way, unless I used the window.

*Id.* at 103-04.

Considering this testimony, the jury was already aware of the possibility that the victim could have left the apartment through a window. The Court has considered this new evidence as well as the entirety of the prosecution's case, including the victim's

11

testimony, the medical evidence, and the results of the search warrant. Based on the foregoing, this Court cannot conclude that no reasonable juror would have found Akard guilty beyond a reasonable doubt even if the photograph described by Akard was admitted into evidence. Akard thus cannot overcome procedural default.

LEGAL STANDARDS

    *A.   Habeas Corpus*

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an

> unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted).

Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

## B. *Ineffective Assistance of Counsel*

To prevail on an ineffective assistance of counsel claim in the State courts, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

at 689. The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

ANALYSIS

    A. *Failure to Introduce Medical Evidence*

Akard claims that the State court made an objectively unreasonable determination that trial counsel's failure to investigate the medical reports and failure to call medical witnesses did not constitute deficient performance. At the post-conviction relief stage, Akard argued that trial counsel failed to obtain rape examination report and failed to call the medical providers who saw the victim immediately after she left Akard's apartment, including EMTs Phil Bushman and Cole Gilbert and Dr. Natalie Schwartz. ECF 14-15 at 14-17. He further argued that

calling these witnesses would have allowed him to prevail at trial.
*Id.*

On appeal at the post-conviction relief stage, Akard alleged that his trial counsel had failed to investigate on numerous occasions and failed to call several witnesses. ECF 14-15 at 9-22. However, the Court of Appeals of Indiana aggregated these allegations into a single claim that trial counsel failed to prepare for trial when it issued the opinion. ECF 14-18 at 22-25. The appellate court found that trial counsel was not deficient in preparing for trial, noting trial counsel's attestation that he had performed a thorough investigation and zealously defended the case. *Id.* at 23. The appellate court further found that Akard pointed to no evidence that would have changed the outcome of the trial had trial counsel presented it. *Id.* at 25.

Review of the trial record reveals that the prosecution presented several witnesses, including the victim and the police officers who searched his apartment and computer equipment. Trial Tr. 60-124, 204-61, 281-97, 327-41. Akard testified at trial, and the defense also presented Akard's friend as a witness, who testified regarding his brief visit to Akard apartment on the night of the incident. *Id.* at 378-88, 407-82.

The prosecution also presented Kathleen Smith, a nurse, who testified regarding her medical examination of the victim. *Id.* at 181-93. During her testimony, the victim's medical file, which

included Smith's report as well as the reports prepared by Dr.
Schwartz and the EMTs, was admitted into evidence. *Id.* at 189;
Trial Ex. 42. Smith's testimony, which suggests that the additional
medical testimony described by Akard, would have been cumulative,
is as follows:

**Prosecution:** And describe---we've already seen pictures
that were taken by the officers there at the emergency
room. Describe to us what you physically saw as far as
injuries.

**Smith:** As near as I can remember because it was two and
a half years ago, it looked like there was a scratch on
her right arm here. Also the scratches on her right
breast area. It looked like on her right wrist there was
a one centimeter, it's just fairly small, in a
(inaudible) area that---

**The Court:** ---excuse me. Why don't you use this as a
pointer. I think it will be easier.

**Smith:** And this looked like a cir---a circular reddened
area. Down here also was a reddened area that was
circular and it was a three and a half centimeters above
her ankle. There was another half a centimeter reddened
over on this side. There were several areas on her back
which were kind of in the shape of oval rings and two
small areas, also, these were all reddened areas and
abrasion on her left elbow. And then she had two small
abrasions on her left eyebrow.

**Prosecutor:** Thank you. Did you find these injuries
consistent with the medical history she gave you that
brought her to the hospital?

**Smith:** Yes.

**Prosecutor:** Okay. Also I believe part of your
examination is you would also do a diagram of the genital
area.

**Smith:** Yes.

**Prosecutor:** And during your examination did you find any injuries or trauma to this area?

**Smith:** There was no bruising or abrasions or redness to all the areas. There were no lacerations noted. She did, in her vaginal (inaudible) did have a whitish colored discharge and because of her age and the fact that she has had children, her hymen was not intact and not visible. And there was some redness noted at the posterior fourchette which is---

**Prosecutor:** ---that was going to be my next question. Where is the posterior fourchette?

**Smith:** This area right in here.

**Prosecutor:** And based on your training and experience, is redness there, would that be consistent with non-consensual?

**Smith:** It could be---the redness there could be from any number of things and usually it's caused by some kind of rubbing.

**Prosecutor:** Okay. And the fact that you did not find any lacerations or bruising in this area, do you find that unusual or inconsistent given her history?

**Smith:** No, we don't. If you think about this area of the body on a female it's a pliable, it's a stretchable area of the female anatomy and it's also---it accommodates child birth so it has to be, you know, pliable and stretching and frequently we don't find any trauma to it.

**Prosecutor:** Even with cases of sexual assault?

**Smith:** Correct.

* * *

**Trial Counsel:** All right. I want to refer then to the exhibit which is of the vaginal area. You made several observations that you recorded on that page, did you not?

**Smith:** Yes.

**Trial Counsel:** Okay. And under the (inaudible) you found no bruising, abrasion, or redness, is that correct?

**Smith:** I just have to find the page, I'm sorry.

**Trial Counsel:** That's all right.

**Smith:** Correct.

**Trial Counsel:** Okay. And the labia minora, no bruising, abrasion, or redness.

**Smith:** Correct.

**Trial Counsel:** And on the posterior fourchette, no bruising, abrasion, or redness.

**Smith:** The arrow going up means increased redness.

**Trial Counsel:** Okay. Saw some redness in that.

**Smith:** Right.

**Trial Counsel:** The urethra, no redness, no bruising, no laceration, correct?

**Smith:** Correct.

**Trial Counsel:** And on the hymen, that was not visible.

**Smith:** Correct.

**Trial Counsel:** The vagina, whitish colored discharge, were you able to determine what that was, what it appeared to be?

**Smith:** No.

**Trial Counsel:** Okay. Was that collected as part of the rape kit?

**Smith:** Yeah, it would have gone into the---when we did the vaginal wash.

**Trial Counsel:** All right. Thank you. And on the cervix it was reddened somewhat but no abrasion.

**Smith:** Correct.

**Trial Counsel:** Okay. And the perineum no bruising, lacerations noted.

**Smith:** Correct.

**Trial Counsel:** Okay. Now you also did a rectal exam, did you not?

**Smith:** We do a rectal smear, but we don't---I mean we do a visual rectal exam.

**Trial Counsel:** Okay.

**Smith:** But we do not do a physical exam.

**Trial Counsel:** Do you record what your observations are with regard to the rectal exam?

**Smith:** Yes.

**Trial Counsel:** Okay. And apparently I'm not able to find that exactly in your report. Could you tell me---find it or if you recall, tell me what your observations were?

**Smith:** If I remember correctly, there was no tearing or redness or anything. Usually if there is, we either take a picture or it's documented.

**Trial Counsel:** Okay. So is it fair to say that there was nothing that appeared to you visually as being out of the ordinary with regard to her anal cavity.

**Smith:** Correct.

* * *

**Trial Counsel:** Okay. Did you note any bruising or swelling about her face or head?

**Smith:** I think the only injury I noted was the abrasion on the eyebrow.

**Trial Counsel:** And you listed that as being two centimeters, which is pretty small.

**Smith:** Yeah.

Trial Tr. 190-98.

After reviewing the trial record, the Court cannot find that the appellate court's determination regarding trial counsel's investigation and trial preparation was objectively unreasonable. Akard argues that the medical reports and testimony of EMTs Bushman and Gilbert and Dr. Schwartz would have revealed that the victim had mobile wrists and ankles, no head trauma, or injuries to the mouth, genital area, or rectal area, no side effects from medication, red and swollen stun gun marks,[5] and drug-seeking behavior. However, Kathleen Smith testified regarding the limited nature of the victim's injuries. Additionally, the medical reports from Bushman, Gilbert, and Dr. Schwartz, which include the medical information detailed in Akard's argument, were admitted into evidence and were given to the jury during deliberations. Trial Tr. 542. Though trial counsel did not call Bushman, Gilbert, or Dr. Schwartz as witnesses, Akard has not shown that their testimony would have produced any additional exculpatory value. Thus this Court cannot find that the appellate court's determination regarding trial counsel's performance was unreasonable.

---

[5] Akard does not contest that he used a stun gun on the victim and asserts that evidence of red and swollen stun gun marks would have made his version of the events more credible.

Moreover, the Court has also considered the evidence presented by the prosecution, including testimony from the victim and police officers, the medical evidence regarding the victim's injuries, and the evidence found at Akard's apartment. Based on the evidence presented at trial, this Court cannot find that the appellate court's determination there is no reasonable possibility that Bushman, Gilbert, or Dr. Schwartz's testimony would have changed the outcome of the trial was unreasonable. Therefore, Akard's claim that trial counsel failed to investigate medical reports and failed to call medical witnesses is not a basis for habeas relief.

### B. *Failure to Object to Child Pornography Evidence*

Akard claims that the State court made an objectively unreasonable determination that trial counsel's failure to object to child pornography evidence did not constitute ineffective assistance of counsel. He argues that, with respect to the child pornography evidence admitted at trial, trial counsel should have filed a motion in limine, objection, or requested a curative instruction. He further argues that the inflammatory evidence had an undue influence on the jury.

At trial, the prosecution argued that Akard confined the victim with the purpose of reenacting scenes from his collection of child pornography. Detective Paul Huff testified as follows:

**Prosecutor:** Okay. Let me just get right to the heart of it then. On the laptop some child pornography was found on there.

**Huff:** That's correct.

**Prosecutor:** And [the victim] had described some very specific photographs that she saw when she was in the defendant's apartment.

**Huff:** Yes, she did.

**Prosecutor:** Are you aware of what or were you made aware of what [the victim] says he---the defendant did to her as far as the actual physical acts?

**Huff:** Yes, ma'am.

**Prosecutor:** Okay. And as part of your examination did you look through the images on the defendant's laptop and find any images that corresponded to the acts that were described by [the victim].

**Huff:** I found several images that were similar to what----

**Trial Counsel:** ---Your Honor, I believe that question can be answered yes or no.

**The Court:** Yes, you can answer that yes or no.

**Huff:** Yes.

**Prosecutor:** My next question is describe, based on what you know [the victim] says was done to her, and you found those corresponding ones, just describe what corresponded to what she described was done to her.

**Trial Counsel:** To which I'll object, Your Honor, on the basis of relevancy.

**The Court:** Overruled. You can answer.

**Huff:** As it pertains to the pictures of children I didn't spend much time on the adult pornography, but as far as the children I found pictures of children that were bound, tied to the bed, had ball gags in their mouth.

Pictures with children who had been basically tied up and gagged.

**Trial Counsel:** We're going to need a sidebar, Your Honor.

**The Court:** Okay.

* * *

**The Court:** We are in the sidebar room. Counsel.

**Trial Counsel:** I presume you're going to make an offer of this.

**Prosecutor:** Yes. Good anticipation, yes.

**Trial Counsel:** You need to make the offer before I can object.

**Prosecutor:** Ok, okay. Judge, Detective Huff went through thousands and thousands of images and found images of children in exactly the same situations that [the victim] described. These are---let me see how many, two, four, six, eight, ten, twelve, fourteen, sixteen, seventeen, eighteen, nineteen---twenty-one and this is out of a sampling. There are many, many more similar pictures and he just printed out a representative sampling.

**Trial Counsel:** Can I have the numbers?

**Prosecution:** I did the whole envelope as one only to keep them in an envelope.

**Trial Counsel:** And that is number…?

**Prosecutor:** One Five Four. And this is the picture we've already introduced as----

**The Court:** ---okay. I've examined the photos now.

**Trial Counsel:** Judge, the basis of my objection to Exhibit One Fifty-One as a group.

**Prosecutor:** Four. One Five Four.

**Trial Counsel:** Oh I'm sorry, One Five Four is, number one, the prejudicial value far outweighs any probative value that these exhibits might have. My guess is, but I don't know, that there may be---there may have been photographs of similar type of situations involving adults which is far less prejudicial. I don't think it necessarily leads to the conclusion that it proves what may or may not have been done to [the victim] based on what photographs were contained on a computer and there's no indication that these photographs, in fact, were viewed by [the victim]. So it may have been some basic relevance, but in this case this is purely offered to inflame the passions of the jury and I think unfairly prejudices the defendant in this case.

**The Court:** Response.

**Prosecution:** [The victim] testified as to her sexual practices that do not include in any way shape or form, binding, gagging, being tied up, being handcuffed, and that's what is being shown in these pictures, which shows it was the defendant's idea to commit these types of acts and therefore she would be less likely to agree to these types of acts. With consent being an issue.

**The Court:** Okay. That's relevancy. Now address the prejudice.

**Prosecution:** Any time you have child pornography they're going to be horrific pictures that nobody wants to look at, but they came from the defendant. The defendant is the source of those pictures and he's the one that performed these acts upon [the victim] and so that's his choice in doing this.

**The Court:** Do you want to respond?

**Trial Counsel:** Yeah, it doesn't necessarily follow that if one possesses photographs of this nature that that's indicative of the sexual practices one may engage in or to prove that any instance of some sexual escapade occurred in a particular way.

**The Court:** I don't meant to cut you off (inaudible).

**Trial Counsel:** Yeah, I'm done.

**The Court:** Again, does he deny that he did what she said he did, in terms of binding her---

**Trial Counsel:** ---there is no denial as to binding her.

**The Court:** Or anal, vaginal.

**Trial Counsel:** There is no denial as to vaginal sex.

**The Court:** Anal.

**Trial Counsel:** There is a denial as to anal sex.

**The Court:** I'm going to overrule the objection. My--- the thing that is of---that links the children to the adults is the shaving and that, you know, all of these are pictures of people of shaved vaginal areas or no vaginal hair and the fact that there was that preparation and the fact that there is children's clothing around and possibly put on her suggests to me a role playing in which she became a little girl, whether intentional or not, I don't know, but, again, the fact that he denies doing some of the things she said he does this is probative that those things occurred and so I think the probative value to that extent would outweigh the prejudicial value if the jury were to accept it. And I think the jury----considering that there is a denial that certain acts occurred that are suggested by these pictures, the fact that she's---this evidence that she was prepared to resemble the people in the pictures makes the---makes me conclude that the prejudice that might exist otherwise does not outweigh the probative value.

\* \* \*

**The Court:** The objection is overruled and Exhibit One Fifty-Four is admitted.

Trial Tr. 330-35.

On appeal at the post-conviction relief stage, Akard claimed that his trial counsel was ineffective for failing to prevent the admission of the child pornography evidence at trial. ECF 14-15 at 12-14. The appellate court referred to the direct appeal decision

and found that Akard was precluded from reasserting his evidentiary claim as an ineffective assistance of counsel claim. ECF 14-18 at 10-11. On direct appeal, the Indiana Court of Appeals affirmed the trial court's ruling on the objection to the child pornography evidence, noting that the evidence was probative of Akard's plans for the victim. ECF 14-6 at 6-7.

After reviewing the record, the Court cannot find that the appellate court's determination regarding trial counsel's failure to prevent the admission of child pornography evidence was objectively unreasonable. To start, trial counsel, in fact, strongly objected to this evidence after anticipating the prosecution's offer of evidence and requesting a sidebar conference. Significantly, there is nothing to suggest that the trial court would have ruled differently if the objection was presented as a motion in limine or a request for a curative instruction. Moreover, even if trial counsel did not object, the State courts ultimately found the evidence to be admissible. On habeas review, federal courts may "not second-guess the state court's determination that the testimony was admissible, and therefore the failure to object cannot be considered deficient." *Sennholz v. Strahota*, 2018 WL 672268, at *3 (7th Cir. 2018). Likewise, "counsel cannot be considered ineffective for failing to make an objection to the introduction of evidence that was properly admitted." *United States v. Neeley*, 189 F.3d 670, 684 (7th Cir.

1999). Because trial counsel objected to the child pornography evidence and because the State courts found the evidence to be admissible, Akard's claim that trial counsel failed to object to child pornography evidence is not a basis for habeas relief.


MOTION FOR DISCOVERY

Akard moves for discovery under Habeas Corpus Rule 6, which states, "A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).

Akard requests the rape kit results and a sexual assault nurse report taken after the victim reported a rape against another individual, two pornographic images from his laptop computer, a transcript of the victim's 911 call, and documentation of the size of his genitals, each for the purpose of discrediting the victim's testimony. However, these materials are not relevant to any of his properly exhausted claims nor did Akard list these materials as

new evidence for his actual innocence claim.[6] These requests are denied.

Akard also requests the photographs taken by police officers of his apartment and of the victim. These photographs may relate to his claim of actual innocence, but they are not necessary for this Court to resolve this claim. Finally, Akard requests depositions from Dr. Natalie Schwartz, EMT Phil Bushman, EMT Cole Gilbert, and the jurors from his trial. Though such testimony may be relevant to Akard's ineffective assistance claims, this Court is required to assess this claim based on "the record that was before [the] state court." *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011). Thus, even if this additional testimony was obtained, this Court could not grant habeas relief based on that testimony. Therefore, this request is denied.

CERTIFICATE OF APPEALIBILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the Court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists

_____

[6] Moreover, even if Akard had listed these items as new evidence, these items as described would not have convinced this court that no reasonable juror could have found him guilty beyond a reasonable doubt.

could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this opinion for denying habeas corpus relief, there is no basis for encouraging Akard to proceed further. For the same reasons, he may not appeal *in forma pauperis* because an appeal could not be taken in good faith.

CONCLUSION

For the reasons set forth above, the Court:

(1)  **DENIES** the habeas corpus petition ECF 1;

(2)  **DENIES** the motion for discovery ECF 18;

(3)  **DECLINES** to issue a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and

(4)  **DIRECTS** the clerk to enter judgment in favor of the Respondent and against the Petitioner.

**DATE: February 22, 2018**             **/s/RUDY LOZANO, Judge**
                                        **UNITED STATES DISTRICT COURT**